# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

KEIONA L. HARRISON,                    )
*also known as* Keiona Harrison,       )
                                       )
    **Plaintiff,**                  )
                                       )
    **v.**                         )      **Case No. 1:17-cv-00419-SLC**
                                       )
CITY OF FORT WAYNE, *et al.*,          )
                                       )
    **Defendants.**                 )

## OPINION AND ORDER

Plaintiff Keiona L. Harrison is bringing suit pursuant to 42 U.S.C. § 1983 against Defendants City of Fort Wayne and Fort Wayne Policy Department ("FWPD") Detective Robert Hollo, Detective George Nicklow, Detective Christopher Hawthorne, and Officer Julie McConnell, alleging the FWPD officers violated her constitutional rights by falsely arresting her, unlawfully searching her person and purse, subjecting her to excessive force, violating the Due Process Clause, racially profiling her, and by failing to intervene on her behalf. (ECF 3 ¶ 2, Ex. A). Harrison also advances state-law claims of false arrest, false imprisonment, battery, and intentional infliction of emotional distress against Defendants. (*Id.* ¶¶ 3, 11). Defendants, in turn, filed counterclaims of defamation and invasion of privacy against Harrison. (ECF 16-1).

Currently before the Court are cross motions for summary judgment filed by Harrison and Defendants. (ECF 65, 76). Both motions have been extensively briefed by the parties. (*See* ECF 67, 77-79, 84-86, 89). Also before the Court is a motion filed by Defendants seeking to strike portions of Harrison's affidavit and deposition filed in support of her motion for summary judgment and in opposition to Defendants' motion. (ECF 83). This motion has also been fully briefed. (*See* ECF 90, 91).

These motions are now ripe for adjudication. Before addressing the motions for summary judgment, the Court must first determine what evidence it may evaluate by addressing Defendants' motion to strike.

## I.  MOTION TO STRIKE

For the following reasons, the Court will GRANT Defendants' motion to strike. (ECF 83).

### A.  *Legal Standard*

Federal Rule of Civil Procedure 56 states that affidavits filed in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "An affidavit not in compliance with Rule 56 can neither lend support to, nor defeat, a summary judgment motion." *Paniaguas v. Aldon Cos.*, No. 2:04-CV-468-PRC, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006) (citing *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1148-49 (7th Cir. 1989); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)).

"[W]hen considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Id.*; *see also Stromsen v. Aluma Shield Indus., Inc.*, No. 89 C 5036, 1993 WL 34727, at *4 (N.D. Ill. Feb. 8, 1993); *Toro Co. v. Krouse, Kern & Co.*, 644 F. Supp. 986, 989 (N.D. Ind. 1986); 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2738 (3d ed. 1998). Specifically, the following statements are not properly included in an affidavit and should be disregarded: (1) conclusory allegations lacking supporting evidence, *see Young v. Monahan*, 420 F. App'x 578, 583 (7th Cir.

2011); (2) legal argument, *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985); (3) inferences or opinions not "grounded in observation or other first-hand personal experience," *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); (4) mere speculation or conjecture, *see Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); and (5) statements in affidavits which blatantly contradict prior sworn testimony in an attempt to create sham issues of genuine dispute, *see Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 624 (7th Cir. 2002); *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996).

### B. Arguments

Defendants seek to strike three specific statements made in Harrison's affidavit and deposition. First, Defendants take issue with Harrison's claim that "[she] committed no criminal act, and [she] did nothing to make any officer believe that [she] had committed a criminal act or that [she] was committing a criminal act." (ECF 83 at 1 (citing ECF 77-1 ¶ 5)). Similarly, Defendants challenge Harrison's claim that "[n]ever, during the events of May 13, 2017, did [she] obstruct, interfere, or forcibly resist . . . ." (*Id.* (citing ECF 77-1 ¶ 6)). Finally, Defendants seek to strike Harrison's statements that she was subjected to "excessive force" and that she "was not committing a crime, and there was absolutely no probable cause for the officers' conduct." (*Id.* (citing ECF 79-1 ¶¶ 7-8)). They argue that each statement is a legal conclusion and argumentative. (*Id.*).

In response, Harrison contends that these statements would be admissible because they are "facts," and because she was in a unique position to testify to them. (ECF 90 at 1). In reply, Defendants reiterate their initial arguments and note that Harrison does not cite any case law in support of her contention. (ECF 91).

## *C. Analysis*

The Court agrees with Defendants that the statements listed above should not be considered. The Court can only consider facts "that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). "The Seventh Circuit has held that 'lay testimony offering a legal conclusion is inadmissible because it is not helpful to the [factfinder] . . . .'" *Larson v. Barrientes*, No. 1:09-cv-55, 2010 WL 2772325, at *3 (N.D. Ind. July 12, 2010) (quoting *United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009)). "This is because a lay witness's purpose is to inform the jury what is in the evidence, not to tell it what inferences to draw from that evidence." *Id.* (citation omitted).

As to Harrison's statements that she was subjected to "excessive force," *Larsen* provides guidance. There, the plaintiff argued that a witness testifying should be allowed to use shorthand expressions such as "unreasonable" and "excessive" when describing a police officer's use of force. *Id.* at *2. The court rejected that argument, noting that the determination of whether force is excessive or unreasonable is reserved for the factfinder. *Id.* at *3; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) ("A court (judge or jury) cannot apply this [objective reasonableness] standard mechanically."). That is, a witness may testify to the facts surrounding a police officer's use of force, but it is for the factfinder to determine whether the "[d]efendant used unreasonable force against [her]." *See* Federal Civil Jury Instructions of the Seventh Circuit § 7.09 (2017). Therefore, Harrison's statements that she was subjected to "excessive force" during the encounter must be excluded.

Harrison's statements regarding the lack of probable cause is similarly an issue for the factfinder to consider. *See Lester v. City of Chi.*, 830 F.2d 706, 715 (7th Cir. 1987) ("Sufficient evidence existed for the jury to find that [police officers] had probable cause to arrest [the

plaintiff] . . ."); *see also Beck v. Ohio*, 379 U.S. 89, 96 (1964) ("[I]t is the function of a court to determine whether the facts available to the officers at the moment of the arrest would warrant a man of reasonable caution in the belief that an offense has been committed." (citation and internal quotation marks omitted)); *Jordan v. City of Chi.*, No. 08 C 6902, 2012 WL 88158, at *7 (N.D. Ill. Jan. 11, 2012) ("Likewise, Mr. Hall's opinion that the charging of Delbert Van Allen . . . was unjustified and wholly lacking in probable cause is also an inadmissible legal conclusion. . . . Mr. Hall's probable cause opinion usurps the role of the judge to instruct the jury on the law (i.e., what constitutes probable cause under Illinois law) as well as the jury (i.e., to determine whether the evidence shows that probable cause to arrest and charge Plaintiff existed)." (citations and internal quotation marks omitted)); *Green v. D'Anna*, No. 95 C 2830, 1995 WL 642808, at *2 (N.D. Ill. Oct. 27, 1995) ("Furthermore, the existence of probable cause is a legal conclusion; thus, Plaintiff's bald allegation that the arrest was made without probable cause is not enough to support his § 1983 claim." (internal citation omitted)).

Harrison's statements that she did not and was not committing a crime are inadmissible for the same reason. Again, a witness may testify to facts, not to what conclusion the factfinder should reach based on those facts. *See United States v. Caputo*, 382 F. Supp. 2d 1045, 1054 (N.D. Ill. 2005) (finding an expert's proffered testimony inadmissible because "he would essentially be telling the jury that Defendants did not commit mail or wire fraud").

Accordingly, the Court will GRANT Defendants' motion to strike (ECF 83) and will disregard the statements identified in Defendants' motion (ECF 77-1 ¶¶ 5-6; ECF 79-1 ¶¶ 7-8). The Court will now turn to the parties' respective motions for summary judgment.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

On a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770 (citation omitted); *see also Snider v. Pekny*, 899 F. Supp. 2d 798, 807 (N.D. Ind. 2012) ("Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor the nonmoving party." (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986))). A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Payne*, 337 F.3d at 770. (citation omitted). However, "a party opposing summary judgment may not rest on the pleadings but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citing *Celotex*, 477 U.S. at 324).

## B. Facts and Background[1]

For the most part, the facts giving rise to the present dispute are undisputed. On May 13, 2017, FWPD Detective Nicklow effectuated a traffic stop in the parking lot of a CVS Pharmacy off Anthony Boulevard in Fort Wayne, Indiana, at approximately 2:47 pm. (ECF 65-1 ¶¶ 5-7; ECF 65-2 ¶¶ 6-10). Detective Hollo and Detective Hawthorne soon arrived on the scene to assist Detective Nicklow. (ECF 65-1 ¶ 9; ECF 65-3 ¶ 3). Harrison, who is African-American, then arrived at the same CVS in her vehicle with her boyfriend, Marcus Hendricks, and her infant child. (ECF 77-1 ¶ 2; ECF 79-2 at 14). Hendricks apparently entered the CVS as Harrison remained outside with the car and child. When she arrived, Harrison noticed "several marked and unmarked police cars, . . . [with] their lights on." (ECF 65-5 at 3; *see also* ECF 63, Ex. E [hereinafter "Dash-Cam"] (forward facing, mounted camera footage from Detective Hollo's squad car showing an unmarked, white SUV, with emergency lights flashing over the rear tailgate)).[2] Detective Hollo's in car Dash-Cam footage shows him, Detective Nicklow, and Detective Hawthorne all in full police uniform. (*See* Dash-Cam).

Upon arriving at the scene, Detective Nicklow informed Detective Hollo that the passenger of the stopped vehicle, Tyronte Wilms, was making furtive movements. (ECF 65-1 ¶ 10). Detective Hollo ordered Wilms out of the vehicle and noticed him walking "lightly/gingerly." (ECF 65-1 ¶ 14; ECF 65-2 ¶ 25). He had Wilms remove one of his shoes,

---

[1] Because Defendants' and Plaintiff's motions concern facts occurring at distinct periods, the Court will only recount the facts relevant to Defendants' motion here, while the facts relevant to Plaintiff's motion will be discussed *infra*.

[2] The Court will credit the video evidence over the deposition and affidavit evidence only when it clear that no reasonable jury could find otherwise. While all inferences are to be made in favor of the non-moving party, when the non-moving party's version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (considering camera footage that clearly contradicted the non-moving party's account of the facts); *Rivera v. Jimenez*, 556 F. App'x. 505, 507 (7th Cir. 2014) (relying on video evidence where it "discredit[ed] the plaintiff's version of events").

which revealed a bag containing multiple colored pills and a handgun. (ECF 65-1 ¶¶ 15-18; ECF 65-2 ¶¶ 28-29). As Detective Hollo transported Wilms in handcuffs to the rear of his squad car, Wilms called out to Harrison, who is Wilms's distant cousin (ECF 79-2 at 18-19), asking her to call his mom to tell her he had been found with a gun and ecstasy. (ECF 65-1 ¶ 21; ECF 65-2 ¶ 35; ECF 65-5 at 4; ECF 79-2 at 22). There is some dispute as to the sequence and quality of the interaction between Wilms and Harrison. Detective Nicklow affied that Harrison called out to Wilms asking, "what happened?" before Wilms responded that he had been caught with a gun and ecstasy. (ECF 65-2 ¶¶ 33-35). Detective Hollo contends that Harrison approached "approximately one foot from" the rear of his squad car and "made contact with Wilms" asking him "what happened?" (ECF 65-1 ¶ 19; ECF 79-4 at 6, 8).  Harrison asserts that she never left the rear of her own vehicle and was "between thirty and fifty feet" away from Wilms at the time he called out to her. (ECF 79-1 ¶ 2; ECF 79-2 at 21-22). Detective Hollo further contends that after speaking with Wilms, Harrison turned her back to him and approached the rear of her vehicle. (ECF 65-1 ¶¶ 28-29). In any event, Harrison appears to have responded "What do you want me to tell her?" before Wilms began giving his mother's phone number. (ECF 65-5 at 6).

After securing Wilms in the rear of his squad car, Detective Hollo can be seen on his Dash-Cam[3] returning to the front of his squad car to inform Detective Nicklow that Wilms had spoken to Harrison. (Dash-Cam at 00:01:03-00:01:35). Detective Hollo states that he is going to get Harrison's name and moves off camera. (*Id.*). Shortly after leaving the frame, Detective Hollo can be heard asking Harrison her name, with Harrison in response asking why he needed it. (Dash-Cam at 0:01:29-0:01:35). Detective Hollo, still out of frame, replied "Because you

<hr>

[3] The Dash-Cam footage begins as Detective Hollo is walking Wilms in front of the squad car. The audio does not begin recording until shortly thereafter. There is no audio recording of Wilms's statement regarding the gun and drugs, or any follow-up comment by Harrison.

were talking to my prisoner." (Dash-Cam at 0:01:35-0:01:40). When Harrison again asked why she needed to give her name, Detective Hollo responded "because you're involved in my investigation now." (Dash-Cam at 0:01:40-0:01:42). Harrison again questioned how she was involved and Detective Hollo said he needed her name for his investigation, to which Harrison responded that she did not do anything. (Dash-Cam at 0:01:42-0:03:00).

Detective Hollo then said that Harrison could "come on over here" and began moving her to the front of the squad car. (*Id.*). While still out of frame, Detective Hollo contends that "Harrison became increasingly loud and began to physically resist by pulling her arms to the front of her. Her body behavior became a little more flailing and aggressive." (ECF 65-1 ¶ 30). Harrison contends that "[Detective Hollo] got angry and put [her] hands behind [her] back and pushed [her] and [dragged her] such that [her] shoe fell off) over to his car where [she] was slammed onto the vehicle." (ECF 77-1 at ¶ 2). On the Dash-Cam, Harrison can be heard telling Detective Hollo that "[he] was grabbing [her] kind of a hard" and asking what was happening, while Detective Hollo can be heard telling Harrison not to pull away from him. (Dash-Cam at 0:01:42-0:03:00; *see also* ECF 65-1 ¶ 30). Jordan Patterson, the driver of the vehicle from the initial stop, testified at his deposition that he saw a police officer matching Detective Hollo's description, pushing Harrison with her arms being held behind her head, from her car to the front of a squad car. (ECF 79-5 at 14). He further testified that Detective Hollo was "extremely physically rough with Harrison. (*Id.* at 23-24).

As Harrison was brought to the front of the vehicle, Detective Hawthorne approached Detective Hollo who asked him for handcuffs, which were then placed on Harrison. (Dash-Cam at 0:01:42-0:03:00). Detective Hollo can also be heard saying that if Harrison continued to move, he would take her "to the ground," because she was starting to make him "concerned for

[his] safety." (*Id.*). Harrison claims she was then "slammed" into the squad car a second time. (ECF 79-2 at 32). During this sequence of events, Harrison also told Detective Hollo that she was an Allen County Adult Probation Officer. (Dash-Cam at 0:01:42-0:03:00).

After Detective Hollo brought Harrison to the squad car, the two can be seen narrowly in frame. Detective Hollo is seen placing Harrison's cell phone and paper money on the hood of the squad car. (Dash-Cam at 0:01:42-0:03:28). He then moved Harrison to the back seat of Detective Hawthorne's squad car. The time from when Detective Hollo first approached Harrison to when she was placed in the squad car was roughly two minutes and thirty seconds. When Harrison asked if she was being arrested, Detective Hollo is heard responding that she was being detained because she was "acting goofy" and did not give him her name. (Dash-Cam at 0:03:28-0:04:05; *see also* 65-1 ¶¶ 26-27). Harrison then asked Detective Hollo if he would like her identification, to which he replied that he would take it in a minute. Harrison responded that it was in her purse. (Dash-Cam at 0:04:00-0:05:50). Detective Hollo, in turn, responded that he would get it, and while still out of frame, appears to have found Harrison's identification and her probation officer badge after asking her where exactly in the purse it was. (*Id.*) Detective Hollo contends that he did not otherwise search Harrison's purse. (ECF 65-1 ¶ 34).

Soon after Harrison was placed in the rear of the squad car, Detective Hawthorne activated the squad car's rear camera showing the back-seat interior of the vehicle. (*See* ECF 63, Ex. F (hereinafter "Rear-Cam")). Around the same time, Officer McConnell can be seen arriving on the scene in a marked squad car, in full uniform, and approaching where Harrison was seated. (Dash-Cam 0:06:30-0:07:00). Detective Hawthorne can be heard telling Harrison that he "was going to have this female officer pat you down real quick, ok?" (Rear-Cam 0:00:30-0:00:40). Harrison's response cannot be clearly heard on video, but during her

deposition she stated that Detective Hollo returned to the car and said "We're going to have a female officer pat you down," to which she responded "That's fine. I don't have anything in my possession or on my person." (ECF 65-5 at 10). In her affidavit, Harrison stated that she "said 'ok' out of fear that if [she] was not compliant, then [she] would suffer additional police brutality." (ECF 79-1 ¶ 13). Eventually, though, Detective Hawthorne brought Harrison out of the squad car for the pat-down. Detective Hawthorne can be heard telling Officer McConnell she could perform the pat-down behind the squad car door so that Harrison was not "out in the open." (Rear-Cam at 0:01:15-0:01:20).

While outside of the vehicle Harrison can no longer be seen on the rear camera and cannot be clearly heard on the audio. Detective Hawthorne appears to have found a dollar belonging to Harrison, which he placed back in her purse after she stated she did not mind if he did so. (Rear-Cam at 0:01:35-0:01:40). Besides placing the dollar, and later a quarter and cell phone back in it, Detective Hawthorn asserts that he did not otherwise open or search Harrison's purse. (ECF 65-3 ¶¶ 11-13). During her pat-down, Officer McConnell contends that Harrison pulled away when she attempted to pat down Harrison's groin area, using the back of her hand, over Harrison's clothes. As such, Officer McConnell states that she had to re-pat the area three times. (ECF 65-4 ¶¶ 8-11).

Harrison testified at her deposition that Officer McConnell began the pat-down with both Detectives Hawthorne and Hollo looking on. (ECF 79-2 at 40-41). Harrison then claimed that Officer McConnell inserted her fingers into Harrison's vagina, prompting Harrison to say "Ow, you're touching my vagina." (*Id.*). Officer McConnell then supposedly moved Harrison behind the squad car door, after stating "Everyone doesn't need to see this," and again inserted her fingers into Harrison's vagina. (*Id.* at 41). Harrison claims that after this second time, she said

in a louder voice "Ow, you're hurting me. Your hands are in my vagina." (*Id.*). She further alleges that she "moved away, because [she] felt violated and humiliated about what [Officer McConnell] was doing." (ECF 79-1 ¶ 15).

Again, the pat-down is not visible on the rear camera. At one point, though, Harrison can be heard saying that Officer McConnell had "touch[ed] [her] vagina." (Rear-Cam at 0:01:30-0:01:40). On the other hand, Officer McConnell, who can be heard throughout the encounter, cannot be heard telling Harrison to move behind the car door.

After the pat-down, Harrison was placed back in the squad car. Detective Hollo, who had been photographing the scene and evidence from the underlying traffic stop, also moved to the back of the squad car and began talking to Detective Hawthorne. (Dash-Cam at 0:06:00-0:09:30).  Again out of frame, Detective Hollo can be heard attempting to explain to Harrison that she was detained because she inserted herself in his investigation and did not give him her name. (Dash-Cam at 0:09:30-0:10:45; Rear-Cam at 0:03:15-0:04:15). Harrison continued to respond that she did not understand why she had been handcuffed and detained, or how she was involved in the investigation. (*Id.*). Eventually, Detective Hollo informed Harrison that she would be released. (*Id.*). As her handcuffs were being removed, Harrison could be heard saying that her handcuffs hurt. Officer McConnell can be heard telling Harrison to "hold still," while Detective Hawthorne can be heard telling her that the cuffs were tightening because she was "moving her wrists." (Rear-Cam at 0:04:30-0:04:40; *see* ECF 65-4 ¶ 13). In her police report, Officer McConnell noted that Harrison was jerking and stiffening her arms as she attempted to remove the handcuffs. (ECF 79-8 at 5). From the time Detective Hawthorne activated the rear camera to when Harrison's handcuffs were removed, roughly five minutes had passed.

After the handcuffs were removed, Harrison remained on scene speaking with Detective Hawthorne. Detective Hawthorne can be heard explaining to Harrison that the fact that she had been on scene speaking with someone who had just been arrested with a gun and drugs raised safety concerns. He also explained that by interacting with their suspect within their "emergency incident scene," she had entered Defendants' investigation. (Rear-Cam 0:06:30-0:10:00).

*C. Analysis*

Defendants raised, and Harrison responded to, a variety of issues in their motion for summary judgment and response. The Court will address each in turn.

1. § 1983 Unlawful Arrest Claim[4]

Defendants contend that Harrison's detention was a proper investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), not an arrest, and even if it did rise to the level of a full arrest, the officers had probable cause to arrest her. (ECF 67 at 13-16). In particular, Defendants allege that Detective Hollo had probable cause to believe that Harrison had violated Indiana's Resisting Law Enforcement Statute, Indiana Code § 35-44.1-3-1, and because probable cause would have supported Harrison's arrest, her § 1983 claim fails. (ECF 86 at 3). Harrison in response contends that the officers lacked both the "articulable suspicion" required to conduct a *Terry* stop and the probable cause required to perform a proper arrest. (ECF 78 at 2-5).

---

[4] In her amended complaint, Harrison states she is suing the Defendant Officers "under the Fourth and Fourteenth Amendments of the United States Constitutions and 42 U.S.C. § 1983 for . . . false arrest, . . . false imprisonment, [and] for deprivation and loss of liberty . . . ." (ECF 43 at 2). While a plaintiff can bring separate false arrest and false imprisonment claims under § 1983, *see Terket v. Lund*, 623 F.2d 29, 31 (7th Cir. 1989), the parties only briefed the issue as a "false" or "unlawful" arrest, (*see* ECF 67 at 13-16; ECF 78 at 2-5). Because the ultimate issue is whether Harrison's detention was reasonable under the Fourth Amendment, and because each claim can be disposed of if Detective Hollo had reasonable suspicion to detain Harrison, the Court will analyze these claims in a single section. *See Pearce v. Thiry*, No. 08 C 4483, 2009 WL 3172148, at *5 (N.D. Ill. 2009) (denying summary judgment as to § 1983 unlawful detention, false arrest, and false imprisonment claims when there was a genuine dispute as to whether the defendants had reasonable suspicion to detain the plaintiff). For the sake of simplicity, the Court will refer to these claims as Harrison's "unlawful arrest" claim.

Detective Hollo's initial approach and questioning of Harrison, by itself, does not tread on her constitutional rights. An officer may freely approach a person in a public space and ask her questions—even if she is under no duty to respond. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Florida v. Royer*, 460 U.S. 491 (1983)). Still more, "[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humbolt Cty.*, 542 U.S. 177, 185 (2004). Once Detective Hollo took control of Harrison's arm and brought her to the hood of the squad car, however, the consensual encounter clearly ended. Detective Hollo can be heard raising his voice, and he used at least some physical force to move Harrison, eventually placing her in handcuffs and into the squad car. When considering the record in the light most favorable to Harrison, this constituted a seizure. *See United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008) ("A consensual encounter becomes a seizure when a reasonable person in those circumstances would not feel free to leave. Circumstances that might indicate a seizure include the threatening presence of several officers, . . . physical touching of the private citizen, [and] use of forceful language or tone of voice. . . ." (internal citations omitted)). Therefore, the relevant question is whether the seizure was a permissible *Terry* stop, an arrest, or a *Terry* stop which became a *de facto* arrest.

Under *Terry* an officer may conduct a "minimal detention, lasting only so long, and intruding on the stopped individual's liberty only so much, as is necessary for an officer to either confirm or dispel a reasonable suspicion that the stopped individual 'has been, is, or is about to be engaged in criminal activity.'" *Rabin v. Flynn*, 725 F.3d 628, 637 (7th Cir. 2013) (Rovner, J., concurring) (quoting *United States v. Bullock*, 632 F.3d 1004, 1014-15 (7th Cir. 2011)); *see also Terry*, 392 U.S. at 28 ("The officer need not be absolutely certain that the individual is armed;

the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). Further, the Supreme Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry*, 392 U.S. at 22-27). Still more, "police officers do not convert a *Terry* stop into a full custodial arrest just by drawing weapons or handcuffing the subject." *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007) (internal citations omitted); *see also United States v. Sakew*, 403 F.3d 496, 507 (7th Cir. 2005) ("For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." (quoting *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994))). However, "[w]hen an officer's use of force during such a *Terry* stop becomes so disproportionate to the purpose of such a stop in light of the surrounding circumstances—and the purpose may include ensuring the safety of the officers or others—then the encounter becomes a formal arrest (which must then be justified by probable cause)." *Rabin*, 725 F.3d at 632-33.

Even when viewing the facts in the light most favorable to Harrison, the record here yields but one conclusion—that the Defendant Officers conducted a permissible *Terry* stop. In determining whether an officer had reasonable suspicion, the Court is to consider the "totality of the circumstances to assess whether the detaining officer ha[d] a particularized and objective basis for suspecting illegal activity." *United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005) (citation and internal quotation marks omitted). This analysis is based on the "circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d

857, 859 (7th Cir. 2006). Reasonable suspicion, while more than a "hunch," is less than

probable cause or even a preponderance of the evidence. *Wardlow*, 528 U.S. at 123.

In her response, Harrison emphasizes that none of her actions prior to the detention were

criminal. (*See* ECF 78). This, however, is not dispositive. In fact, the very activity justifying

the stop in *Terry*—pacing in front of a store—in and of itself is completely innocent. *Terry*, 392

U.S. at 22. Similarly, in *Cady v. Sheahan* the Seventh Circuit Court of Appeals found that:

> an officer is entitled to conduct a limited stop and related protective search for
> weapons of an individual who is lurking amongst the bushes outside a courthouse
> two hours before it opens, is shabbily dressed, carrying a briefcase, claims to be a
> federal process server, *refuses to provide identification upon request, and is
> evasive in response to police questioning*.

467 F.3d 1057, 1062 (7th Cir. 2006) (emphasis added). Analogous to the instant case, the

suspect there when first asked for identification, refused and continually asked the law

enforcement officers "what crime [they] suspected [he] was committing, was about to commit, or

had committed." *Id.* at 1059. Still more, in *Gray v. City of Hammond*, the court considered an

instance where a car was stopped near a crime scene, having not committed any traffic

infraction, when a suspect was at large, and the occupants were ordered out of the vehicle and

detained after refusing to identify themselves. 693 F. Supp. 2d 823, 828-30 (N.D. Ill. 2010).

There, Chief Judge Theresa Springmann held, on summary judgment, that the officers had

reasonable suspicion to perform a *Terry* stop, noting:

> [A Hammond Police officer] initiated a traffic stop of the Plaintiffs' vehicle for
> purposes of investigating whether that vehicle was in any way involved with the
> serious crime that had just been committed, particularly whether the suspect was
> inside. According to both [officers], the [Plaintiffs] did not immediately comply
> with police commands, thereby increasing the officers' level of suspicion.

*Id.* at 837.

Based on the undisputed facts, Harrison spoke with an arrestee-who had just admitted to having a firearm and narcotics, during an active crime scene, in a high crime area. When asked by Detective Hollo for her name, Harrison can be clearly heard on the Dash-Cam footage questioning why he needed her name. Given these facts, a reasonable jury could only conclude that Detective Hollo had a reasonable suspicion that Harrison may have been involved with Wilms or may have posed a threat to the surrounding community.[5] Therefore, the Defendant Officers were permitted to temporarily detain Harrison while they assuaged their concerns. *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) ("Given that officers were conducting a search for drugs, it was reasonable to place Bullock in handcuffs and in the squad car for their safety while they pursued their investigation.").

Likewise, even when viewing the facts in the light most favorable to Harrison, a reasonable jury could only conclude that the *Terry* stop here did not become a *de facto* arrest. "In differentiating between [an arrest and a *Terry* stop], the touchstone is reasonableness: Were the officer's actions reasonable in light of all the circumstances?" *Jewett*, 521 F.3d at 824. Placing Harrison in handcuffs and in the squad car is not necessarily dispositive as to whether the stop morphed into a full arrest. While Harrison estimated in her deposition that roughly fifteen to twenty minutes passed between when she was brought to the hood of the squad car to when she was released (ECF 79-2 at 49), a review of the camera footage in this matter shows that the interaction lasted less than ten minutes. *See Bullock*, 632 F.3d at 1015 (listing cases finding permissible *Terry* stops lasting over twenty minutes). Further, any delay on the part of Detectives Hollo and Hawthorne in waiting for Officer McConnell was reasonable. *See United*

---

[5] Furthermore, as discuss *infra*, any mistake on Detective Hollo's part as to the existence of reasonable suspicion would itself have been reasonable, entitling him to qualified immunity. *See Jewett v. Anders*, 521 F.3d 818, 823 n.4 (7th Cir. 2008) ("Qualified immunity protects those officers who make a reasonable error in determining whether there is reasonable suspicion to conduct a *Terry* stop." (collecting cases)).

*States v. Swift*, 220 F.3d 502, 509 (7th Cir. 2002) (holding it was reasonable to detain a robbery suspect fifteen minutes until more officers arrived).

Lastly, that the pat-down occurred does not necessarily turn the stop into an arrest. Again, even the stop upheld in *Terry* involved a protective pat-down. *Terry*, 392 U.S. at 7 ("Officer McFadden proceeded to pat down the outer clothing of Chilton and the third man, Katz."); *see also United States v. Brown*, 188 F.3d 860, 864 (1999) (upholding a pat-down as part of a *Terry* stop when an officer has reasonable suspicion the suspect was armed and dangerous). Further, whether the pat-down was warranted or conducted properly is not necessarily determinative as to whether the stop itself was proper. *See Verdier v. Borough*, 796 F. Supp. 2d 606 (E.D. Pa. 2011) (finding, on summary judgment, that the plaintiff's seizure was proper under *Terry*, but allowing the plaintiff's unlawful search claim as to the subsequent frisk to proceed); *Gray*, 693 F.Supp.2d at 841 (proceeding with an excessive force claim after dismissing the unlawful arrest claim on summary judgment).

In summation, even when viewing the facts in the light most favorable to Harrison, a reasonable jury could only conclude that Defendants performed a permissive investigatory stop, not an arrest. Accordingly, Harrison's § 1983 claim for unlawful arrest must fail. *See Ramos* v. *City of Chi.*, 716 F.3d 1013 (7th Cir. 2013) (upholding a grant of summary judgment on a false arrest claim where the defendants performed an investigative stop); *see also Rabin*, 725 F.3d 628 (same). Therefore, Defendants' motion as to Harrison's § 1983 unlawful arrest claim is GRANTED.

2. § 1983 Excessive Force Claim

In her amended complaint, Harrison alleges that "Defendants, and each of them, violated Plaintiff's rights of due process and to be free from excessive force . . . under the Fourth and

Fourteenth Amendment of the United States Constitution." (ECF 43 ¶ 12). Defendants contend that only minimal force was used in effectuating the *Terry* stop; while Harrison contends that it was excessive. (ECF 67 at 16; ECF 78 at 5). Specifically, Harrison relies on her claims that she was dragged to the squad car with such force that she lost her shoe, was "slammed" into the hood of the car, and was subjected to a "quasi-cavity" search. (ECF 78 at 5).

Even if Harrison's detention was proper pursuant to *Terry*, the Court "must examine whether the manner in which it was executed . . . was 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)). The Court has determined that it was permissible for Detective Hollo to initiate a *Terry* stop, and that this "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "The constitutional measure of an officer's use of force under the Fourth Amendment is whether the officer's actions were 'objectively reasonable in light of the facts and circumstances confronting [him] . . . .'" *Martin v. Indiana*, No. 1:12-CV-69-SLC, 2015 WL 4899008, at *13 (N.D. Ind. Aug. 17, 2015) (alterations in original) (quoting *Graham*, 490 U.S. at 397).

However, on the record presented, it is unclear what level of force was used to effectuate the stop. Harrison claims that she was dragged from her vehicle to the squad car with great force and was "slammed" into the hood of the squad car. Similarly, Jordan Patterson testified that Detective Hollo handled Harrison "extremely" physically rough. Detective Hollo, in turn, asserts that Harrison stiffened her body and attempted to pull away from him. Unlike the length of the interaction or the words spoken, these events cannot be objectively determined from the video evidence. There is also a material factual dispute as to whether Officer McConnell

inserted her fingers into Harrison's vagina during the pat-down. As such, the determination of whether Detective Hollo and Officer McConnell used excessive force under the circumstances is based upon which individual's testimony the factfinder would find most credible. Thus, this is not a matter that can be resolved on summary judgment.

The same cannot be said, however, about the excessive force claims against Detectives Nicklow or Hawthorne. As the Seventh Circuit noted when interpreting the Supreme Court's excessive force jurisprudence, "the Court's authoritative discussion of excessive force [*Graham*], repeatedly says or assumes that there cannot be *excessive* force without *some* force, referring variously to physically abusive governmental conduct, physical force, and force applied to a suspect." *McNair v. Coffey*, 279 F.3d 463, 467 (7th Cir. 2002) (internal citations and quotation marks omitted) (quoting *Graham*, 490 U.S. at 391 n.5, 392, 394). There, the Court of Appeals considered a case where the defendant called for backup when attempting to pull the plaintiffs over for a traffic stop. When the plaintiffs eventually did pull over, "they were surrounded by eight squad cars and told to get out with their hands up; many officers leveled weapons at [them]." *Id.* at 465. While noting that the actions of all of the police officers at the stop could have implicated the Constitution in different ways, the Court of Appeals found that "even taking the record in the light most favorable to the [plaintiffs], a jury could not have found that [the defendant] *personally* behaved unreasonably" under the Fourth Amendment. *Id.* at 467 (emphasis in original).

The same can be said here as to Detectives Nicklow and Hawthorne. As is clear from the Dash-Cam footage, Detective Nicklow spent the majority of the underlying incident in and around the unmarked white SUV, across the parking lot, before walking away from Harrison. (Dash-Cam 0:00:00-0:03:00). In her deposition, Harrison even stated that she did not have

personal contact with him, just that "he was just there" and "[h]e exchanged words with [Hendricks]." (ECF 77-3 at 47). While Detective Hawthorne was physically closer at the relevant times, and spoke with Harrison, there is nothing showing him making physical contact with her. Further, Harrison testified that she "didn't say that [Detective Hawthorne] did anything other than being present." (ECF 77-3 at 50). While she did testify that "[Detectives] Hawthorne and . . . Nicklow, never intervened or diffused the situation," this is subject to her failure-to-intervene claim. As such, because Harrison failed to cite to any evidence which would support an excessive force claim against Detectives Nicklow or Hawthorne, Defendants' motion is GRANTED as to these two officers. For the reasons discussed above, though, Defendants' motion as to Harrison's excessive force claims against Detective Hollo and Officer McConnell is DENIED.

### 3.  § 1983 Unlawful Search Claim as to Harrison's Person

Defendants contend that Officer McConnell properly "patted down" Harrison to ensure officer safety pursuant to the *Terry* stop, and that in any event, Harrison consented to the pat-down. (ECF 67 at 16-17). Harrison, in response, argues that because the *Terry* stop was improper, the search was improper, and that any consent she gave was coerced. (ECF 78 at 4).

As mentioned, even if Defendants were justified in detaining Harrison, this does not necessarily mean that a pat-down was proper. "To justify a warrantless pat-down search without probable cause, the officer must also be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others." *Brown*, 188 F.3d at 864. "[T]he standard is whether the pat-down search is justified in the totality of the circumstances even if each individual indicator would not by itself justify the intrusion." *Id.* at 865 (upholding a pat-down search at a traffic stop where the defendant appeared excessively

nervous, refused to meet the officer's gaze, continually looked back to his car, and was in a "bad neighborhood"). That being said, a subject can always consent to a pat-down search. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1998) ("[It] is no doubt reasonable for the police to conduct a search once they have been permitted to do so."). The scope of a consensual search, though, is what a reasonable person would have understood by the exchange between the officer and suspect. *Id.*

Consent to search can be express or implied. *Lovi v. Vill. of Arlington Heights*, 62 F. Supp. 3d 756, 763 (N.D. Ill. 2014). As to implied consent, the Court must consider: (1) whether Harrison's actions could reasonably be interpreted as manifesting consent, and (2) whether that consent was voluntary. *Id.* (citing *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)). Factors to consider in determining voluntariness include:

> (1) the age, education, and intelligence of the individual; (2) whether [she] was advised of [her] rights; (3) whether [she] was in custody; (4) how long the individual was detained prior to consenting; (5) whether consent was given immediately or after several requests; and (6) whether the officers used physical coercion.

*United States v. Thompson*, 842 F.3d 1002, 1009-10 (7th Cir. 2016).

Here, there is too much ambiguity as to the circumstances justifying a pat-down and the scope of the pat-down to grant Defendants' motion for summary judgment. While there may have been enough reasonable suspicion to temporarily detain Harrison, the mere fact that she was at a crime scene does not necessarily infer that she was armed and dangerous. *See United States v. Ruffin*, 448 F. Supp. 2d 1015, 1019 (E.D. Wis. 2006) ("Egly relied solely on his belief that defendant was involved in the robbery; he pointed to no behavior causing him to believe that defendant was armed. Defendant followed all of Egly's instructions, made no furtive movements and did not resist in any way. Further, prior to patting him down, Egly observed no

bulges in defendant's clothing suggestive of a weapon."). Further, facts which may support Detective Hollo's claim that he believed Harrison may have had a weapon, such as whether Harrison was reaching toward the door of her car, are disputed.

Of course, there is evidence in the record that Harrison consented to the pat-down, in the form of deposition testimony. However, if the factfinder was to find that Harrison was subjected to excessive force, this could weigh in favor of her claim that the consent was coerced. Further, even if the jury were to find that the consent was voluntary, there would be a material factual dispute as to whether the search—more pointedly, the alleged cavity search—exceeded the scope of that consent. The resolution of the matter again depends on which individual's version of the story the factfinder finds more credible—Harrison's or Officer McConnell's. Accordingly, when viewing the record in the light most favorable to Harrison, a reasonable jury could find for Harrison.

Finally, Harrison's amended complaint suggests she is bringing suit against *each* of the Defendant Officers for this claim. (*See* ECF 43 ¶ 3 (Defendant [FWPD] Officers Nicklow, Hollo, Hawthorne and McConnell . . . are herein sued . . . for conducting a cavity search without cause or reason and without a warrant . . . .")). But Harrison again fails to cite to any evidence that Detectives Nicklow, Hawthorne, or Hollo performed any action which could plausibly constitute a cavity search. Presumably, though, Detective Hawthorne or Detective Hollo made the decision to pat-down Harrison which, as discussed, may have been improper. (*See* ECF 79-4 at 4 (Officer McConnell testifying that she does not recall who called her to the scene)). Accordingly, Defendants' motion as to the unlawful search of Harrison's person is GRANTED as to Detective Nicklow, but DENIED as to Detectives Hollo and Hawthorne, who may have

ordered the pat-down, and Officer McConnell, who performed the pat-down and alleged cavity-search.

4. <u>§ 1983 Unlawful Search Claim as to Harrison's Purse</u>

Defendants also allege that Harrison's purse was not searched, and any entry into the purse, such as to get her identification or return her money, was consensual. (ECF 67 at 17-18). Harrison contends that she never truly consented to the search. (ECF 78 at 5-6; ECF 79 ¶ 8 ("My identification was obtained by Hollo going into my car without my consent and searching for my identification. This happened only after I was coerced and threatened with being thrown to the ground.")).

Here, one could take Harrison's silence after Detective Hollo told her that he would get her purse as implied consent to search her purse. On the other hand, as already concluded, there is a dispute over whether the Detective Hollo and Officer McConnell used excessive force in detaining Harrison. Both the use of force and the detention are factors which could support a finding that Harrison's consent to search was not truly voluntary. *See Thompson*, 842 F.3d at 1009-10. Accordingly, there is a genuine dispute as to the material facts pertaining to Harrison's claim of unlawful search of her purse, which precludes the entry of summary judgment on this claim.

Again, though, Harrison's amended complaint suggests that she is suing all of the Defendant Officers for the search of her purse. (*See* ECF 11 ¶ 11 ("[T]he officers went to [Harrison's] vehicle and took her purse from the seat and opened it (a Fourth Amendment wrongful search) . . . .")). From the undisputed evidence before the Court, the only two officers who had any contact with the purse were Detectives Hollow and Hawthorne. But the record reflects that Detective Hawthorne only placed items into Harrison's purse, with her consent.

Accordingly, to the extent that Harrison is alleging that Detective Hawthorne, Detective Nicklow, and Officer McConnell searched her purse, no reasonable jury could find for her. As such, Defendants' motion as to the unlawful search of Harrison's purse is GRANTED as to Detective Hawthorne, Detective Nicklow, and Officer McConnell, but DENIED as to Detective Hollo.

5. § 1983 Due Process Claims

Plaintiff concedes that her due process claims should be dismissed. (ECF 78 at 6). Therefore, Defendants' motion for summary judgment is GRANTED in this regard.

6. § 1983 Racial Profiling Claim

Because Harrison has not shown that there was a discriminatory purpose on the part of the officers or provided evidence of disparate impact, Defendants argue her claims fail as a matter of law. (ECF 67 at 18-20). Harrison contends that there was no other possible basis for her detention besides racial animus—contending that Detective Hollo's explanations were *post hoc* fabrications. (ECF 78 at 6-7). As a result, she contends that a jury could infer that "race was a factor." (*Id.* at 7). Harrison is suing not just Detective Hollo, but each Defendant, for racial profiling. (ECF 43 ¶ 12 ("Defendants, and all of them, targeted Plaintiff because of her race and color, African American/black ...... ")).

"[Harrison] allege[s] that [D]efendants are liable under 42 U.S.C. § 1983, which 'requires proof that the [D]efendants were acting under color of state law and that the [D]efendants' conduct violated [her] rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Chavez v. Ill. State Police*, 251 F.3d 612, 628 (7th Cir. 2001) (quoting *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 471 (7th Cir. 1997)). Claims that law enforcement used "impermissible racial classifications in determining whom to stop, detain, and search" are

analyzed as Equal Protection Clause violations. *Id.* at 635. "To show a violation of the Equal Protection Clause, [Harrison] must prove that the [D]efendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Id.* at 635-36.

Harrison's racial profiling claim against the City of Fort Wayne is clearly deficient. "Local governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). In her response, Harrison fails to cite any evidence that the Defendant Officers' actions were the result of a regulation, order, or custom of the City of Fort Wayne. Similarly, Harrison fails to provide any statistical evidence tending to show "whether one class is being treated differently from another class that is otherwise similarly situated." *Chavez*, 251 F.3d at 638. Accordingly, Defendants' motion for summary judgment is GRANTED to the extent that Harrison is raising a racial profiling claim against the City.

As to the racial profiling charges against the Defendant Officers, Harrison similarly fails to present any evidence tending to show that racial animus motivated any of the individual officers' conduct. "Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Here, broadly speaking, Harrison's only evidence that any of the Defendant Officers acted with racial animus is her speculation that they would have treated non-African Americans differently. While Harrison need not provide evidence that these particular Defendants refrained from treating others in a similar manner as her, *see Geinosky v. City of Chi.*, 675 F.3d 743, 746 (7th Cir. 2012) ("in a straightforward official harassment case like the allegations here, forcing

the plaintiff to name a person not so severely harassed serves no . . . purpose"), she still must present some evidence of racial animus. *Compare Rouei v. Vill. of Skokie*, 61 F. Supp. 3d 765, 773-74 (N.D. Ill. 2014) (denying a motion for summary judgment where the plaintiff offered evidence that the defendant used racial slurs tending to show racial animus), *with Chriswell v. Vill. of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *11 (N.D. Ill. Nov. 4, 2013) ("Although Chriswell's allegation that 'the color of her skin prompted [the defendants] to pull her over' mark her claim as one for racial profiling, it is conclusory; she fails to allege facts that would plausibly support that inference." (alteration in original)). Therefore, Defendants' motion for summary judgment as to Harrison's racial profiling claims against the Defendant Officers is also GRANTED.

7. § 1983 Failure-to-Intervene Claims

As mentioned above, Harrison is also contending that the Defendant Officers had the opportunity to intervene and prevent the alleged constitutional violations. Defendants, in turn, allege that, because Harrison cannot show any constitutional violations on the part of any Defendant Officer, she cannot show that any other Defendant Officer failed to intervene on her behalf. (ECF 67 at 20). Harrison in turn contends that her detention, arrest, and search were all constitutional violations that other Defendant Officers should have been aware of and stopped. (ECF 78 at 7).

In general, a law enforcement officer can be held liable under § 1983 if the plaintiff can show that the officer: "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). "Whether an officer has sufficient time to intervene or was capable of preventing the harm caused by the other

officers is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibl[y] conclude otherwise." *Smith v. Daniels*, No. 01 C 4157, 2003 WL 1717635, at *7 (N.D. Ill. Mar. 28, 2003) (citing *Lanigan*, 110 F.3d at 478). "At least one court has found that a reasonable jury could find that a nonparticipatory officer who had more than a split second to react to excessive force but less than a minute could have acted to prevent the harm, at least by telling the malfeasant officer to stop." *Id.* (citing *Thorner v. City of Harvey*, No. 97 C 4573, 1998 WL 355526, at *11 (N.D. Ill. June 24, 1998)).

To the extent that Harrison is alleging a failure to intervene on the part of Officer McConnell to prevent the alleged excessive force and unlawful arrest, that claim obviously fails because Officer McConnell did not arrive on the scene until after Harrison was already seated in the rear of the squad car. However, issues of fact preclude summary judgment on the failure-to-intervene claims against the other Defendant Officers. The exact location of each of the officers during the course of events is not always clear on the video. Detective Hawthorne is first seen in frame, walking towards Detective Hollo and Harrison, when Harrison was already to the hood of the squad car. (Dash-Cam 0:02:00-0:02:20). At roughly the same time, Detective Nicklow is seen parking the unmarked white, police SUV and walking across the parking lot and away from where Detective Hollo had Harrison at the hood of the car. (Dash-Cam 0:01:50-0:03:00). Just as there is a genuine dispute as to whether Detective Hollo used excessive force in detaining Harrison, the factual record is unclear as to what, if anything, Detective Hawthorne and Detective Hollo saw from their respective vantage points at that time. (*See* ECF 79-2 at 33 ("I believe . . . Hawthorne was in close proximity [when she was slammed into the car.]")). On the other hand, a jury could find that neither Detective Hollo nor Officer McConnell used excessive

force, in which case Detectives Nicklow and Hawthorne would have had no duty to intervene. Thus, this issue should be reserved for the factfinder at trial.

As to the "quasi-cavity search" claim, Harrison testified in her deposition that Officer McConnell began the pat-down with both Detectives Hawthorne and Hollo looking on. (ECF 79-2 at 40-41). Harrison then claimed that Officer McConnell inserted her fingers into Harrison's vagina, prompting Harrison to say "Ow, you're touching my vagina." (*Id.*). Officer McConnell then supposedly moved Harrison behind the squad car door and again inserted her fingers into Harrison's vagina. (*Id.* at 41). This second time Harrison claims she responded louder, "Ow, you're hurting me. Your hands are in my vagina." (*Id.*). The Dash-Cam video, however, clearly shows Detective Hollo in front of the squad car photographing the scene and Wilms's shoes, and not watching the pat-down. (Dash-Cam 0:07:35-0:09:45). Harrison fails to point to any evidence concerning the location of Detective Nicklow at any point, but he can be heard speaking to Detective Hollo and moving around an unmarked police SUV across the parking lot. *Id.* During the pat-down, as Harrison is heard saying that Officer McConnell was "touching [her] vagina," Detective Hawthorne can be seen at the rear of the squad car, through the back windshield. (Rear-Cam at 0:01:30-0:2:45).

Again, however, it is unclear what each respective Defendant Officer saw or heard during the course of the pat-down. Taking the facts in the light most favorable to Harrison, a jury could presumably find that even Detectives Hollo and Nicklow, who are shown to be across the parking lot during the pat-down, could have heard Harrison call out after Officer McConnell allegedly touched her vagina, and thus, they could have prevented Officer McConnell from doing so a second time. The same can be said of Detective Hawthorne, who was arguably in a better position at the rear of the squad car. As such, this issue too is best left to the factfinder at

trial. Accordingly, Defendants' motion for summary judgment is GRANTED as to Harrison's failure-to-intervene claim against Officer McConnell, but DENIED with respect to the other Defendant Officers.

8.  Qualified Immunity to Federal Claims

Defendants next contend that the Defendant Officers are entitled to qualified immunity because Harrison cannot make out a violation of a clearly established constitutional right. (ECF 67 at 20-21). Harrison, however, contends that the officers committed multiple constitutional violations. (ECF 78 at 7).

"Qualified immunity shields public officials from liability when they act in a manner that they reasonably believe to be lawful, even if their judgment proves to be mistaken." *Misher v. Barnett*, No. 07 CV 5242, 2010 WL 2136659, at *3 (N.D. Ill. May 26, 2010). "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations and internal quotation marks omitted). In evaluating the defense of qualified immunity, the Court must consider whether the facts Harrison alleged make out a violation of a constitutional right, and whether the right at issue "was clearly established at the time of the [D]efendant[s'] alleged misconduct." *Id.* at 232. "Qualified immunity is dissolved, however, if a plaintiff points to a clearly analogous case establishing a right to be free from the specific conduct at issue or when the conduct is so

egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chi.*, 242 F.3d 737, 742 (7th Cir. 2001).

In her response, Harrison argues that the "contours of the Fourth Amendment were clearly established on May 13, 2017" and primarily focuses on Defendants' supposed lack of probable cause to arrest her. (ECF 78 at 7). However, as already concluded, Harrison was not arrested but was detained pursuant to an investigatory stop, and thus, there was no violation of a constitutional right. In fact, Harrison fails to cite any analogous case that established the conduct at issue here—detaining a woman for refusing to identify herself at an active crime scene, in a high crime area, after speaking to a detainee on scene—was a violation of a constitutional right. Further, this case is analogous to cases, cited *supra*, in which courts have upheld *Terry* stops under similar circumstances. Accordingly, while the Court has already concluded that Defendants' motion for summary judgment should be granted on Harrison's unlawful arrest claim because the Defendant Officers had reasonable suspicion to detain Harrison, the qualified immunity analysis bolsters that conclusion.

Concerning the excessive force and "quasi-cavity" search claims, Harrison again fails to cite any analogous cases considering similar circumstances. But this is not necessarily determinative, as a plaintiff may also make a "showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Here, it is disputed whether Harrison was resisting Detective Hollo's attempts to detain her, whether she was "slammed" into the squad car, and whether Officer McConnell inserted her fingers into Harrison's vagina. Similarly, there is a genuine dispute as to whether Harrison truly consented to the search of her purse and the pat-down or was subjected to undue coercion. *See Lovi*, 62 F.

Supp. 3d at 767 (finding that police officers were not entitled to qualified immunity where there was a dispute as to whether consent was given under coercion); *see also Knight v. Kerstein*, 836 F. Supp. 2d 719, 725 (N.D. Ill. 2011) ("Knight, therefore, has raised a genuine dispute of a material fact precluding summary judgment on her claim that the amount of force used against her by Hakim and Asmussen was excessive. Further, the questions of fact prevent summary judgment in favor of these two Deputies on grounds of qualified immunity."); *Gray ex rel. Gray v. City of Columbus*, No. IP98-1395-C H/G, 2000 WL 683394, at *1 (S.D. Ind. Jan. 31, 2000) ("The central question now before the court is whether a police officer in the United States violates the Fourth Amendment by requiring a person who is not under arrest for a crime to submit to a warrantless strip search and body cavity search. At least outside the unique context of an international border search, the answer is yes now, it was yes in 1996, and the applicable law has been clearly established at both times."). Accordingly, because Defendants' assertion of qualified immunity on the claims of excessive force and unreasonable search rests on disputed facts, Defendants' qualified immunity defense cannot save their motion for summary judgment on these claims.

### 9. State-Law Battery Claims

Turning now to Harrison's state-law claims, Harrison in her amended complaint alleges that the Defendant Officers "committed battery" against her. (ECF 43 ¶¶ 2, 12). Defendants, though, only move for summary judgment on Harrison's battery/sexual battery claim against Officer McConnell. (ECF 67 at 21-22).

In that regard, Defendants allege that Harrison's state-law battery and sexual battery claims against Officer McConnell must fail as Officer McConnell only used minimal force in

conducting a proper pat-down. (ECF 67 at 21-22). In response, Harrison contends that Officer

McConnell used excessive force by forcing her fingers into Harrison's vagina. (ECF 78 at 8-9).

The parties briefed the issues of "battery" and "sexual battery" separately with respect to

Harrison's claim against Officer McConnell. (*See* ECF 67 at 21-22; ECF 78 at 8-9). But "[i]n

Indiana, sexual battery is not recognized as a specialized tort separate from battery." *Zander v.*

*Orlich*, No. 2:14-CV-400-PRC, 2017 WL 2289349, at *5 (N.D. Ind. May 25, 2017) (citing

*Lessley v. City of Madison, Ind.*, 654 F. Supp. 2d 913 (S.D. Ind. 2009) ("Evidence of sexual

motivation or conduct can be aggravating conduct for the long-recognized torts of assault and

battery but has not been recognized in Indiana as giving rise to a new tort."); *Oliver by Hines v.*

*McClund*, 919 F. Supp. 1206, 1219 (N.D. Ind. 1995) ("[T]here is simply no recognized tort

action in Indiana for sexual battery . . . .")).[6] Thus, the Court will treat Harrison's sexual battery

and battery claims as a single state-law battery claim. *See Pritchett v. Heil*, 756 N.E.2d 561, 566

(Ind. Ct. App. 2001) (analyzing a "sexual battery" claim as a battery).

Under Indiana law, a person commits a battery if: "(a) he acts intending to cause a

harmful or offensive contact with the person of the other or a third person, or an imminent

apprehension of such a contact, and (b) a harmful contact with the person of the other directly or

indirectly results." *Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007) (quoting

Restatement (Second) of Torts § 13 (1965)). Further, "if an officer uses unnecessary or

excessive force, the officer may commit the torts of assault and battery." *Wilson v. Isaacs*, 929

N.E.2d 200, 203 (Ind. 2010). Again, the measure of whether an officer's use of force is

excessive is whether the officer's actions were "objectively reasonable in light of the facts and

circumstances confronting them . . . ." *Graham*, 490 U.S. at 397.

---

[6] Defendants in their brief cite to Indiana Code § 35-42-4-8, which lists the elements to the *crime* of sexual battery, not an independent tort action.

Here, as already concluded, there is a genuine dispute as to whether Officer McConnell inserted her fingers into Harrison's vagina during the pat-down. A reasonable jury could find, if true, that such force was not reasonable under the circumstances. *See Mary Beth G. v. City of Chi.*, 723 F.2d 1263, 1273 (7th Cir. 1983) (finding a city policy requiring strip and visual cavity searches of women detained in the city lockup awaiting bond, regardless of offense or suspicion that the women concealed weapons or contraband, violated the Fourth Amendment). Similarly, there are genuine issues of material fact as to whether Detective Hollo used excessive force against Harrison. Accordingly, the Court DENIES summary judgment on the battery claims against Detective Hollo and Officer McConnell.

As to the battery claims against Detectives Nicklow and Hawthorne, though, they are DISMISSED. As the Court already discussed in connection with Harrison's excessive force claim, Harrison does not account for Detective Nicklow during the majority of the incident. Further, from what is seen from the videos, Detective Nicklow never made contact with Harrison, let alone used any force against her. Likewise, there is no evidence that Detective Hawthorne had any physical contact with Harrison. Therefore, for the same reasons Harrison's § 1983 excessive force claims were dismissed against Detectives Nicklow and Hawthorne, her state-law claims of battery against these two officers fail as well.

10. State-Law False Arrest and False Imprisonment Claims

Defendants also seek summary judgment on Harrison's state-law false arrest and false imprisonment claims. The parties' arguments mirror those advanced with respect to Harrison's § 1983 unlawful arrest claims. Specifically, Defendants argue that Harrison was properly detained pursuant to *Terry*, and that Harrison failed to sustain her burden of proving the absence of

probable cause. (ECF 67 at 22-23). Harrison, in turn, argues that there was no probable cause to arrest her. (ECF 78 at 9).

"An arrest by a law enforcement officer without probable cause can give rise to civil liability for false arrest under Indiana common law." *Row v. Holt*, 864 N.E.2d 1011, 1013 (Ind. 2007). As concluded earlier, however, a reasonable jury could only find that Harrison was lawfully detained pursuant to *Terry* but not arrested. This dooms Harrison's state-law false arrest and false imprisonment claims. *See Snider,* 899 F. Supp. 2d at 810 ("The initial detention was thus lawful and cannot support a claim for false imprisonment); *Alexander v. Doe,* IP 01–1674–C–K/T, 2003 WL 22244782 (S.D. Ind. Aug. 20, 2003) ("If a defendant has probable cause to arrest the plaintiff or reasonable suspicion to make a *Terry* stop, or if the plaintiff cannot show an absence of probable cause or reasonable suspicion, then the plaintiff's false imprisonment claim fails."); *Chestnet v. K–Mart Corp.,* 529 N.E.2d 131, 134 (Ind. Ct. App. 1988) ("If a detention is lawful, by definition, it cannot constitute false imprisonment."). In other words, Harrison's "state law false arrest claim therefore also fails for the same reasons that [her] [unlawful] arrest claim under § 1983 fails." *Snider*, 899 F. Supp. 2d at 819. Therefore, Defendants' motion for summary judgment is GRANTED as to Harrison's state-law false arrest and false imprisonment claims.

11. State-Law Intentional Infliction of Emotional Distress Claim and State-Law Immunity Under Indiana Code § 34-13-3-3(8)

Defendants next assert that they are immune from Harrison's intentional infliction of emotional distress and other state-law claims pursuant to the Indiana Tort Claims Act ("ITCA"), more specifically Ind. Code § 34-13-3-3(8), which immunizes government employees from losses caused by enforcing the law unless the act of enforcement constitutes false arrest or false

imprisonment. (ECF 67 at 24). Harrison contends that immunity does not attach because Defendants were not "enforcing the law," but instead were violating the law by "unlawfully detaining, arresting, and manhandling her." (ECF 78 at 10).

When considering whether an officer is entitled to immunity under the ITCA, the Court "first determine[s] whether the officer was acting within the scope of his or her employment when the injury to a plaintiff occurred and, second, whether the officer was engaged in the 'enforcement of a law' at that time." *Snyder v. Smith*, 7 F. Supp. 3d 842, 874 (S.D. Ind. 2014) (citation omitted). An officer may engage in misconduct to an extensive degree and still be within the scope of his employment for purposes of this statute, "so long as 'his purpose was, to an appreciable extent, to further his employer's business, even if the act was predominantly motivated by an intention to benefit the employee himself.'" *Id.* at 875 (quoting *Ellis v. City of Martinsville,* 940 N.E.2d 1197, 1209 (Ind. Ct. App. 2011)).

This standard is exceptionally broad. In *City of Anderson v. Weatherford*, for example, the plaintiff argued that the defendants' conduct—arresting him for a misdemeanor at a public basketball game his child was playing—was, "extreme and outrageous," and thus outside the scope of the defendant police officers' employment. 714 N.E.2d 181, 185 (Ind. Ct. App. 1991). The Indiana Court of Appeals held that the defendants were immune from suit for intentional infliction of emotional distress in part because it was the police department's "business . . . to execute a duly issued warrant." *Id.* at 186. Further, the court noted that "[e]ven the commission of an intentional criminal act may be considered as being within the scope of employment if the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope." *Id.* (alteration in original) (quoting *Kemezy v. Peters*, 622 N.E.2d 1296, 1295 (Ind. 1993)).

Here, at least as to Harrison's intentional infliction of emotional distress claim, Defendants are immune under the ITCA. Performing investigative stops and pat-down searches at active crime scenes, in most cases, "furthers the business" of a municipal police department. As such, the Court "cannot conclude that, as a matter of law, the officers' [detention and search] was so incompatible with the performance of their employment as to be deemed outside the scope of their employment thereby depriving them of the protection specifically set forth in [the ITCA]." *Id.* Therefore, Defendants' motion for summary judgment as to Harrison's intentional infliction of emotional distress claim is GRANTED.

On the other hand, "a law enforcement officer's use of force in excess of the reasonable force authorized by statute is *not* shielded from liability under the 'enforcement of a law' immunity provided in Indiana Code § 34–13–3–3(8) . . . . " *Wilson*, 929 N.E.2d at 201-02 (emphasis added) (finding that genuine issues of material fact precluded an entry of summary judgment). More pointedly, "the Indiana Supreme Court has held that the ITCA does not immunize police officers in excessive force cases from liability for assault and battery." *Elliott v. Sheriff of Rush Cty., Ind.*, 686 F. Supp. 2d 840, 868 (S.D. Ind. 2010) (citing *Kemezy*, 622 N.E.2d at1297). Accordingly, the ITCA has no impact on Harrison's remaining state-law battery claims against Detective Hollo and Officer McConnell. *Id.*

12. *Respondeat Superior* Liability

Defendants next contend that even if the individual officers were liable for battery, false imprisonment, and false arrest, the City would not be vicariously liable as these torts were not within the scope of their employment. (ECF 67 at 24-25). Harrison, in response, contends that *respondeat superior* attaches, "as none of these officers were operating within the law." (ECF 78 at 10).

To the extent Harrison is raising this argument as to the § 1983 claims, it fails as a matter of law. "This is because governmental entities may not be held liable under § 1983 under a theory of *respondeat superior*." *Snider*, 899 F. Supp. 2d at 809 (citing *Monell*, 136 U.S. at 691). Rather, "[g]overnmental entities can . . . be held liable only for injury caused by conduct that represents an official policy, whether it be an express policy, an unwritten practice or custom with the force of law, or the decision of an official with final policymaking authority." *Id.* (citing *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 817 (7th Cir. 2001)). Said another way, a municipality can only be held accountable under § 1983 for Harrison's supposed loss, if she can point to: "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008). Harrison fails to provide any evidence that the Defendant Officers' actions were the result of a practice or custom of the City of Fort Wayne. Accordingly, Defendants' motion for summary judgment on Harrison's § 1983 claims against the City of Fort Wayne is GRANTED.

Turning to the remaining state-law claims, "because police officers' employer-conferred power is so great, the range of acts for which a city may be vicariously liable stretches far." *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 460 (Ind. 2018) (collecting cases). "Under Indiana's scope-of-employment rule, an employer is liable for employees' tortious acts that arise naturally or predictably from the employment context." *Id.* at 461. This includes actions that are "egregious, malicious, or [even] criminal." *Id.* Thus, a municipality may be liable for conduct even if it was not done at the municipality's direction or for the municipality's benefit. "Rather, the tortious act must come from a course of conduct the employee performs in the employer's service." *Id.* at 464.

The Indiana Supreme Court in *Cox* ultimately determined that a reasonable jury could find the cities of Evansville and Fort Wayne liable under a theory of *respondeat superior* for criminal sexual assaults perpetrated by their police officers while on duty. As to the FWPD officer in *Cox*, the Indiana Supreme Court considered that "he was on duty, wearing his police uniform, and exhibiting the coercive power and authority accompanying his official duties." *Id.* at 464. Here, like the FWPD officer in *Cox*, the Defendant Officers were in full uniform, at an active crime scene, and on duty. Similarly, a reasonable jury could find that, if true, the alleged "quasi-cavity search" and force used to detain Harrison arose naturally and predictably from the employment context. Thus, Defendants' motion for summary judgment on Harrison's state-law battery claim against the City of Fort Wayne under *respondeat superior* is DENIED.

13. Punitive Damages

Finally, Defendants allege that Harrison's punitive damages claims must fail as she cannot show the requisite "evil motive or intent." (ECF 65 at 25). Harrison contends that a factfinder could infer the requisite intent from Defendants' "deliberate and reckless" actions. (ECF 79 at 10).

A municipality cannot be held liable for punitive damages in a suit brought under § 1983. *City of New Port v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). Similarly, "Indiana law does not allow punitive damages against governmental entities," including cities. *Reiner v. Dandurand*, 33 F. Supp. 3d 1018, 1034 (N.D. Ind. 2014) (citing Ind. Code § 34-13-3-4(b); *Kelley v. Michigan City*, 300 F. Supp. 2d 682, 690 (N.D. Ind. 2004)). Therefore, as a matter of law, Harrison cannot recover punitive damages for any federal or state-law claims against the City of Fort Wayne.

However, with respect to the Defendant Officers, "[a] 'jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be

motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Id.* at 1033 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). To the extent that genuine issues of fact preclude summary judgment on certain claims, they also preclude a decision regarding punitive damages with respect to the Defendant Officers. Taking the facts in the light most favorable to Harrison, a jury could find that the Defendant Officers had the requisite intent to support punitive damages. *See McKinley v. Trattles*, 732 F.2d 1320, 1325 (7th Cir. 1984) (upholding a jury award of punitive damages against a prison guard who improperly conducted a strip search, inserting his finger in a prisoner's anal cavity); *Reiner*, 33 F. Supp. 3d at 1034 (denying summary judgment as to punitive damages where defendant's argument was "essentially a rehash of the substantive argument" made as to summary judgment). Accordingly, "summary judgment cannot be granted on [Harrison's] claims of punitive damages as they pertain to the Officers in their individual capacities." *Kelley*, 300 F. Supp. 2d at 690.

### III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

#### A. *Facts and Background*

On September 20, 2018, Defendants filed their answer (ECF 44) to Harrison's amended complaint (ECF 43) asserting counterclaims for libel, slander, defamation, and invasion of privacy based on statements Harrison made to her supervisors Michael Manuel and Eric Zimmerman in May 2017 and to FWPD officer Miguel Rivera in 2018.

The facts as to the disputes surrounding these counterclaims begin with the factual underpinnings of Harrison's claims against Defendants. On May 13, 2017, while Harrison was being released from the handcuffs, Detective Hollo can be heard asking Harrison who her supervisors at the Allen County Adult Probation Department were, and that he would be calling them regarding the incident. (Rear-Cam at 0:40:30-0:05:00; ECF 79-4 at 36). Harrison can be

heard giving the names of April Winfield and "Mike Manuel." (Rear-Cam at 0:40:30-0-0:05:00; *see also* ECF 77-3 at 7 (Harrison testifying that she had four supervisors)).

The Allen County Circuit Court Employee Handbook, which applies to probation officers, states that "[a]ll employees must report, within 5 days, any arrest for any criminal offense to their designated supervisor." (ECF 77-2 at 2). Harrison attests that based on this requirement, she felt compelled to speak with Zimmerman and Manuel about her detention and treatment. (ECF 77-1 ¶ 8). As such, she spoke with Manuel on the phone right after the incident and with Zimmerman the following Monday. (ECF 77-3 at 54). Harrison also later spoke with Miguel Rivera, a FWPD officer—first on the phone and later in person—about being a potential witness in this matter. (ECF 77-4 at 21-23).

Defendants allege that during each of these conversations, Harrison made false and defamatory statements—namely that she was sexually assaulted by Officer McConnell, racially profiled, and subjected to excessive force. Manuel testified that Harrison told him that a female FWPD officer "touched her in her private parts and all that" and that a FWPD officer "slammed her against the police car." (ECF 84-6 at 5-6). Zimmerman testified in his deposition that Harrison stated the officers "handl[ed] her rough" and that Officer McConnell "put her hands up her sun dress" and "cavity searched" her. (ECF 84-5 at 5). Rivera testified that Harrison told him that she felt she was racially profiled and groped. (ECF 84-7 at 4-6).

### B. Analysis

Harrison argues that her statements are subject to a qualified privilege and therefore Defendants' counterclaims fail as a matter of law. (ECF 77 at 5). She further asserts that, in any event, Defendants have made no showing that she made her statements in bad faith. (*Id.* at 6-7). Finally, she contends that Defendants' counterclaims should be precluded as a matter of public

policy. [7] (*Id.* at 7; ECF 89 at 1). Defendants contend genuine issues of fact exist as to whether

Harrison's statements were made with ill will and malice.[8] (ECF 85).

Under Indiana law, "[a] communication is defamatory *per se* if it imputes: (1) criminal

conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or

occupation; or (4) sexual misconduct." *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007). "To

maintain an action for either *per se* or *per quod* defamation the plaintiff must demonstrate (1) a

communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." *Id.*

at 596-97.

In support of her argument, Harrison primarily relies on *Lawson v. Howmet Aluminum*

*Corp.*, 449 N.E.2d 1172 (Ind. Ct. App. 1983). As the Court there noted:

> The defense of qualified privilege will protect a communication made in good
> faith on any subject matter in which the party making the communication has an
> interest or in reference to which [she] has a duty either public or private, either
> legal, moral, or social if made to a person having a corresponding interest or duty
> . . . .

*Id.* at 1176 (quoting *Elliott v. Roach*, 409 N.E.2d 661, 672 (Ind. Ct. App. 1980) (internal

quotation marks omitted)). "The protection of a qualified privilege may be lost if the plaintiff

shows that the speaker was primarily motivated by feelings of ill will toward the plaintiff, if the

---

[7] While the Court is certainly cognizant of Harrison's public policy arguments, Harrison does not cite any Indiana caselaw on point to the issue, and acknowledges that the "Firefighter's Rule" while analogous to what she is suggesting, "does not exactly fit." (ECF 89 at 1). As a result, the Court declines to expound on issues of state law absent some controlling state precedent. *See Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir. 1987) ("We write only to emphasize that our policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court."); *see also Ry. Express Agency, Inc. v. Super Scale Models, Ltd.*, 934 F.2d 135, 138 (7th Cir. 1991) ("Indeed, more recent opinions of this court have strongly encouraged district courts to dismiss actions based on novel state law claims.").

[8] Before turning to the substance of the parties' argument, the Court observes that Defendants in their response brief allege that Harrison made defamatory statements to the local media, to the FWPD's Internal Affairs division, in her deposition, and in her state court complaint. (ECF 85 at 9-11). However, Defendants were only granted leave to amend their answer to bring defamation claims based on the statements made to Manuel and Zimmerman (ECF 30 at 7), and later the statement made to Rivera (ECF 42 at 6).

privilege was abused by excessive publication of the defamatory statement, or if the statement was made without belief or grounds for belief in its truth." *Id.* (citation omitted).

Defendants, in response, claim that a jury could infer that Harrison's statements were made in "bad faith," therefore defeating the defense of qualified immunity, and with "actual malice," supporting a finding of defamation *per se*. *See McCollough v. Noblesville Schs.*, 63 N.E.3d 334, 348 (Ind. Ct. App. 2016) ("Actual malice, as an element of the tort of defamation, exists when the defendant publishes a defamatory statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964))); *see also Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223, 1232 (Ind. Ct. App. 2005) ("The existence of a qualified privilege does not change the actionable nature of the words spoken. Rather the privilege rebuts the element of malice implied by law for the making of a defamatory statement." (citation and internal quotation marks omitted)).

Whether Harrison acted "without belief or grounds for belief in . . . [the] truth" or with "reckless disregard" for the truth, depends on what the truth of the matter actually is. Here, there is a genuine dispute as to the extent of the force used against Harrison, and whether Officer McConnell exceeded the bounds of a proper pat-down. Viewing the facts in the light most favorable to Defendants, a reasonable jury could find both malice and a lack of good faith on Harrison's part if they credit Defendants' version of the events over Harrison's. *See Cortez*, 827 N.E.2d at 1233 ("[I]f the facts are in dispute, then the question of privilege should be submitted to the jury." (citation omitted)). Accordingly, Plaintiff's motion for summary judgment is DENIED.

# IV.  CONCLUSION

In summary, Defendants' motion to strike (ECF 83) is GRANTED. Harrison's motion for summary judgment (ECF 76) is DENIED, and Defendants' counterclaims of defamation survive against Harrison. Defendants' motion for summary judgment (ECF 65) is GRANTED IN PART and DENIED IN PART, in that only the following claims survive against Defendants:

(1) the state-law battery claim against the City of Fort Wayne under *respondeat superior*;

(2) the § 1983 excessive force, § 1983 unreasonable search of person, § 1983 unreasonable search of purse, § 1983 failure-to-intervene, and state-law battery claims against Detective Hollo;

(3) the § 1983 failure-to-intervene claim against Detective Nicklow;

(4) the § 1983 failure-to-intervene and § 1983 unreasonable search of person claims against Detective Hawthorne;

(5) the § 1983 excessive force, § 1983 unreasonable search of person, and state-law battery claims against Officer McConnell; and

(6) the claim for punitive damages against the Defendant Officers.

SO ORDERED.

Entered this 31st day of March 2020.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge